UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

JOSEPH B.,

        **Plaintiff,**

v.                                                                             8:19-CV-330 (NAM)

**ANDREW M. SAUL, COMMISSIONER**
**OF SOCIAL SECURITY,**

        **Defendant.**

---

**Appearances:**

Mark A. Schneider
Schneider & Palcsik
57 Court Street
Plattsburgh, New York 12901
*Attorney for Plaintiff*

Sean Santen
Social Security Administration
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, Massachusetts 02203
*Attorney for Defendant*

**Hon. Norman A. Mordue, Senior United States District Court Judge**

MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Joseph B. filed this action under 42 U.S.C. § 405(g), challenging the denial of his application for Social Security Disability ("SSD") insurance. (Dkt. No. 1). The parties' briefs are presently before the Court. (Dkt. Nos. 11, 14). After carefully reviewing the administrative record, (Dkt. No. 8), and considering the parties' arguments, the Court reverses the denial decision and remands for further proceedings consistent with this Order.

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for disability benefits in March 2016, alleging that he became disabled on July 26, 2015. (R. 141–44). Plaintiff asserted that he is disabled due to lower back pain, hypertension, neuralgia neuritis, ocular migraines, sleep disorder, anxiety, and depression. (R. 162). The Social Security Administration ("SSA") denied Plaintiff's application on May 16, 2016. (R. 82–87). Plaintiff appealed that determination and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 88–89). The hearing was held on December 28, 2017 before ALJ Asad M. Ba-Yunus. (R. 30–65). Plaintiff was represented at the hearing by Kimberly Wills, a non-attorney representative. (*See* R. 32–33). On February 6, 2018, the ALJ issued a decision finding that Plaintiff was not disabled. (R. 19–26). Plaintiff's subsequent request for review by the Appeals Council was denied on February 22, 2019. (R. 1–6). Plaintiff then commenced this action on March 18, 2019. (Dkt. No. 1).

### B. Plaintiff's Background and Testimony

Plaintiff was born in 1970. (R. 159). He graduated from high school in 1988 and received additional vocational training in "residential electricity." (R. 40, 163). Plaintiff worked as a lift operator at a manufacturing plant from December 1994 through July 2015, when he claims that he could no longer work due to his medical conditions. (R. 162–63).

Plaintiff testified that he lives with his elderly mother and his teenage son. (R. 40). He noted that he is "very limited due to pain." (R. 174). Regarding his daily activities, Plaintiff reported that he spends much of his time watching television and using the computer. (R. 171). He reported that he can attend medical appointments, go grocery shopping, prepare "quick meals," walk to the mailbox, and perform light household chores

2

such as vacuuming and dusting with intermittent breaks. (R. 173). He stated that his pain has not reduced his ability to manage his finances. (R. 175).

Plaintiff reported that he is still able to drive short distances and noted that sitting increases the pain in his back. (R. 41, 174). He estimated that he could stand for roughly 15 to 20 minutes before his legs go numb. (R. 53, 173). He stated that he could walk for a block before needing to stop and rest. (R. 177). He reported that his legs and back ache from sitting. (R. 58). He stated that he needs to "constantly chang[e] positions [and] stand up periodically [to] stretch out." (R. 176). He noted that he spends most of his time "watching television on his side with a pillow between [his] knees or behind [his] back." (R. 57).

Plaintiff further reported that his migraines cause nausea, blurred vision, and sensitivity to light and sound. (R. 179). He claimed that he "cannot do anything" when he has a headache and noted that his former employer would send him home when he got a headache at work. (*Id.*). He stated that his headache medication "does not take the pain away," and "only helps take the edge off." (*Id.*).

### C. Medical Evidence of Disability

#### 1. Lynn Schneider, ANP-C

From 2006 through 2016 Plaintiff received his primary care at the medical practice of Dr. Stephen Hausrath, where he was typically seen by Nurse Practitioner ("NP") Lynn Schneider. (R. 256–365, 370–84). On July 29, 2015, Plaintiff visited NP Schneider complaining of low back pain across his lumbar and sacral area, which went down his right leg and caused numbness when standing for any length of time. (R. 299). Plaintiff reported that he had been suffering with pain for one year. (*Id.*). NP Schneider noted that Plaintiff walked with a slow gait and found that his straight leg raise test was positive bilaterally. (R. 300). A

3

lumbar spine x-ray showed degenerative disc disease with no acute findings. (R. 364). NP Schneider wrote that she suspected that Plaintiff had a bulging disc and diagnosed Plaintiff with sciatica. (R. 300). She advised Plaintiff to alternate heat and ice and prescribed Hydrocodone for his pain. (*Id.*).

Plaintiff received an MRI on August 4, 2015, which indicated:

> Small focal extended disc herniation at L5-S1 on the right that causes displacement of the right S1 nerve root. Correlate clinical with radiculopathy.
>
> There is degenerative spondylosis at L4-L5 with mild disc bulging, but no herniation or central stenosis and no nerve impingement.

(R. 242).

Plaintiff presented to NP Schneider again on August 6, 2015 complaining of continued pain and reporting that he did not respond well to the pain medication. (R. 301). NP Schneider reported that Plaintiff exhibited slow gait and a positive straight leg raise test. (R. 302). She assessed that Plaintiff had a "severe disc bulge and nerve impingement," and noted that she would refer him to a neurosurgeon for further evaluation. (*Id.*).

Plaintiff presented to NP Schneider several times through the fall and winter of 2015 for continued back pain. (R. 303–18). Plaintiff treated his pain with various medications, steroid injections, and physical therapy throughout this period. (*Id.*). In September 2015, Plaintiff reported that his pain was a three on a ten-point scale while sitting, and a six or seven when he walked more than a few blocks. (R. 305). NP Schneider observed that Plaintiff had full strength and a full range of motion of the spine, but his straight leg test was still positive bilaterally. (*Id.*). In October 2015, Plaintiff reported that his pain had improved when he was in a sitting position to a zero on at ten-point scale, but his pain when walking was still a six.

4

(R. 307). His straight leg raise was still positive, but he exhibited full strength and range of motion. (R. 308).

On February 12, 2016, Plaintiff indicated that he had returned to work but could not sit or stand for longer than 10 minutes without experiencing pain. (R. 319). NP Schneider noted that Plaintiff had a slow, waddling gait, but exhibited full strength and full range of motion. (R. 320).

In May 2016, Plaintiff presented to NP Schneider for his annual exam. (R. 323–25). Plaintiff reported that he was not working. (R. 323). NP Schneider noted that he exhibited "no signs of acute distress," and assessed a full range of motion with full strength in his extremities. (R. 324). She noted that he continues to suffer from chronic back pain. (R. 325).

On June 23, 2016, NP Schneider completed a Medical Source Statement indicating that she had seen Plaintiff monthly since July 2015. (R. 366–69). She noted that Plaintiff suffered from ongoing symptoms of "severe backpain and numbness in [his] bilateral lower extremities." (R. 366). She identified Plaintiff's diagnoses as "low back pain and neuralgia," and "neuritis and radiculitis." (*Id.*). She described his prognosis as "guarded," because his "symptoms were not yet under control." (*Id.*). She assessed that his pain would "constantly" interfere with his attention and concentration. (*Id.*). She found that Plaintiff could only: (1) sit for 20 minutes at one time before needing to stand up; (2) sit less than 1 hour in a normal workday; (3) stand for 10 minutes at one time; (4) walk for 5 minutes at a time before needing to sit; and (5) stand and walk for less than 1 hour in a normal workday. (R. 367–68). She found that he would need unscheduled breaks throughout the day—"most likely every 30 minutes" for "10-20 minutes" at a time. (R. 368). She assessed that Plaintiff would be "off task" for more than 30 percent of the workday, would be absent from work "5 days or more" per month, and would be unable to complete full workdays "5 days or more" per month. (R.

369). She stated that her assessments were based on Plaintiff's medical history, his physical examinations, progress notes, therapy reports, X-Rays and MRIs. (*Id.*).

On May 3, 2017, Plaintiff presented to NP Schneider for his annual physical examination. (R. 381–83). NP Schneider noted that Plaintiff suffers from chronic back pain that is "non surgical." (R. 381). Plaintiff reported that he was generally "feeling well," but he had suffered "2 [months] of agonizing pain in his joints and legs." (*Id.*). Plaintiff stated that he was not currently working and was taking Ibuprofen as needed for his pain symptoms. (*Id.*). NP Schneider assessed that Plaintiff could not stand, sit, or walk for greater than 10 minutes, and cannot lift anything heavier than 5 pounds. (R. 382–83).

On March 2, 2018, Dr. Hausrath adopted and co-signed NP Schneider's prior Medical Source Statement from June 2016, writing: "I have personally seen and examined [Plaintiff], reviewed the medical records and reviewed [NP Schneider's Medical Source Statement]. I agree with the documented findings and recommendations." (*See* R. 12–15, 366–69).

On March 8, 2018, NP Schneider wrote a letter on Plaintiff's behalf responding to many of the findings made in the ALJ's denial decision. (R. 10–15). NP Schneider clarified that Plaintiff had tried multiple medications in an effort to control his pain level, but he was "forced to discontinue each of these medications due to severe side-effects." (R. 10). She assessed that Plaintiff "cannot walk, sit, or stand for more than 10 minutes at a time, and must frequently lay down due to the severity of his pain." (*Id.*). She opined that "[t]hese restrictions prohibit him from partaking in any form of employment, sedentary or otherwise." (*Id.*). NP Schneider also noted Plaintiff saw a neurosurgeon in August 2015, but due to the location of Plaintiff's herniation and degeneration, his injuries "cannot be corrected with surgery."[1] (*Id.*).

---

[1] There are several references to Plaintiff's consultation with a neurosurgeon ("Dr. Horgan") throughout the record, but the record does not contain any treatment notes or medical source statements documenting that consultation. (*See* R. 10, 237, 302, 316, 339, 353).

6

As an alternative, Plaintiff was treated with steroid injections, which were also ineffective in controlling his pain. (*Id.*). She stated that the current treatment plan "consists primarily of symptom/pain control efforts," including "frequent rest and repositioning." (*Id.*).

### 2. Champlain Spine & Pain Management

On August 28, 2015, Plaintiff saw NP Brian Lecuyer at Champlain Spine and Pain Management for an initial pain management consultation. (R. 216). Plaintiff reported that he had suffered from lower back pain for years and that the pain increased with any lumbar spine extension. (*Id.*). NP Lecuyer noted that Plaintiff's straight leg raise test was positive bilaterally. (R. 217). Plaintiff indicated that he would prefer to treat his pain with injections, rather than physical therapy and chiropractic manipulations. (R. 218).

On September 8, 2015, Plaintiff received a lumbar branch block injection with no complications. (R. 214–15). At the follow-up appointment, Plaintiff reported an 85 percent improvement in the pain radiating down his leg, but he noted that he continued to have back pain. (R. 212). Plaintiff had a series of additional injections in September and October, but consistently reported no relief. (R. 206–11). Plaintiff declined additional injections. (R. 207).

### 3. North Country Chiropractic

On December 21, 2015, Plaintiff presented to Dr. Benoit at North Country Chiropractic complaining of lower back pain. (R. 229). Dr. Benoit reported that he treated Plaintiff for his back pain until January 20, 2016, when Plaintiff discontinued treatment. (*Id.*).

### 4. Adirondack Physical Therapy

On February 22, 2016, Plaintiff went to Physical Therapist ("PT") Elizabeth Theeman at ADK Physical Therapy for his lower back pain. (R. 221–22). Plaintiff noted that his back pain was generally somewhere between a five and eight on a ten-point scale. (R. 221). He explained that standing and sitting provoke his symptoms, and that steroid injections,

7

medication, and chiropractic manipulation had not improved his pain. (*Id.*). On examination, PT Theeman noted that Plaintiff "demonstrated generally poor tolerance to movement and position change," and found that the "[straight leg raise] test provoked his right lower extremity at 30 degrees." (R. 222). PT Theeman noted that the goals for Plaintiff's treatment were to "centralize and/or eliminate radicular back pain," and to "resume [activities of daily living] with minimal to no pain." (*Id.*).

On February 29, 2016, PT Theeman noted that Plaintiff demonstrated a "poor tolerance to exercise," and experienced "increased lumbar pain/stiffness with most activities." (R. 224). Plaintiff stated that he recently aggravated his mid-back after he "tried to help [his] buddy flip his boat over." (*Id.*). On March 3, 2016, Plaintiff indicated that his lower back pain was the same, despite performing his prescribed at-home exercises. (R. 225).

After four therapy sessions, Plaintiff indicated that physical therapy posed a financial burden for him and that he "would like to conserve his resources." (R. 227). PT Theeman recommended discontinuing regular appointments given Plaintiff's "minimal response" and "poor pain tolerance to exercise." (*Id.*). She provided Plaintiff with at-home posture and strength exercises, and suggested that he resume therapy if his pain control and symptoms improved. (*Id.*). PT Theeman noted that she did not anticipate Plaintiff to have "any ability to tolerate increased exercise in the near future." (*Id.*).

### 5. Psychiatric Consultative Examination

In April 2016, Plaintiff presented to Carly Mount, Psy.D. for a consultative psychiatric evaluation. (R. 231–35). Plaintiff reported that he was on medical leave from work since July 2015, and had worked for his employer for more than 21 years. (R. 231). He informed Dr. Mount that he had "never been psychiatrically hospitalized or seen by an outpatient treatment provider." (*Id.*).

Plaintiff reported that he had experienced symptoms of depression and anxiety since February 2016. (R. 232). He stated that "he is occasionally down and sad," and that he cries frequently. (*Id.*). He reported not being as social and not doing things that he used to be able to do because of his physical ailments and his lowered self-esteem. (*Id.*). Plaintiff denied any suicidal ideation. (*Id.*). He also noted that he "experiences worry, feels overwhelmed, and has racing thoughts." (*Id.*). He is concerned about how he is going to raise his son and take care of financial issues. (*Id.*).

Dr. Mount noted that Plaintiff's thought processes were "coherent and goal directed." (R. 233). She assessed that his mood was "dysthymic," and found that his affect was "dysphoric and tearful." (*Id.*). Dr. Mount reported that Plaintiff's memory skills were "intact," but his attention and concentration were "mildly impaired due to emotional distress [due] to depression, anxiety, and pain." (*Id.*). She found that Plaintiff's insight and judgment were "fair" and that his cognitive functioning appears "within the average range." (*Id.*). Dr. Mount also noted that Plaintiff is able to dress, bathe, groom himself, cook, clean, do laundry, and shop, all with intermittent breaks. (R. 233–34). He is able to manage money and drive short distances. (R. 234).

Dr. Mount's medical source statement concluded that:

> The claimant is able to follow and understand simple directions and instructions and perform simple tasks independently. He has mild limitation maintaining attention and concentration and maintaining a regular schedule. He is able to learn new tasks, perform complex tasks independently, and make appropriate decisions. He has mild limitation relating adequately with others and mild to moderate limitation appropriately dealing with stress. Difficulties are caused by depression and anxiety symptoms.
>
> The results of the evaluation appear to be consistent with psychiatric problems, but in and of itself this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

9

(*Id.*). She found that Plaintiff's prognosis was "fair, given the mental health symptoms reported," and noted that Plaintiff "could benefit from individual psychological therapy." (R. 235).

### 6. Physical Consultative Examination

In May 2016, Plaintiff presented to Nader Wassef, M.D. for a consultative internal medicine examination. (R. 236–43). Plaintiff reported that his primary complaints were lower back pain and migraines. (R. 236–37). He stated that he experiences migraines once or twice per month, and they can last up to two days. (R. 236). He explained that he has never been hospitalized for his migraines, and noted that "Advil seems to help." (*Id.*). Plaintiff explained that he suffered from "constant" lower back pain for many years, which radiates down his right leg and is aggravated by physical activity. (*Id.*). He reported no improvement in his pain despite receiving epidural injections, physical therapy, and chiropractic manipulations. (R. 237). He stated that he consulted with a surgical physician, but no surgery was recommended. (*Id.*). Plaintiff also reported struggling with sleep problems, repeated bouts of bronchitis, arm pain, and breast pain. (*Id.*).

Dr. Wassef reported that Plaintiff is obese, noting that he "weighs 303 lbs and he is 5'8" in height." (R. 236). Dr. Wassef observed that Plaintiff did not appear to be in any acute distress, had normal gait, could stand briefly on heels and toes, had normal stance, could raise from a chair without difficulty, and needed no help getting on an off the exam table. (R. 239). He observed that Plaintiff could not walk on his heels and toes and needed help removing his socks. (*Id.*). Dr. Wassef noted that Plaintiff's straight leg raise was negative bilaterally, that he had full flexion in his cervical spine, and full rotary movement. (R. 240). Plaintiff exhibited full range of motion in his shoulder, elbows, forearms, wrists, hips, knees, and ankles. (*Id.*). Dr. Wassef found that Plaintiff had no sensory deficit, and full

10

strength in his upper and lower extremities. (*Id.*). Dr. Wassef's medical source statement concluded that:

> [Plaintiff] should be accommodated in a quiet environment. He has moderate limitations in regard to standing, walking, climbing and descending stairs, bending, squatting, lifting, sitting, operating foot control[s], pushing, pulling, and handling.

(R. 241). He found that Plaintiff's prognosis was "fair." (*Id.*).

### D. ALJ's Decision Denying Benefits

On February 6, 2018, the ALJ issued a decision denying Plaintiff's application for disability benefits. (R. 19–26). At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since July 26, 2015, the alleged onset date of his disability. (R. 21).

At step two, the ALJ found that, under 20 C.F.R. § 404.1520(c), Plaintiff had seven "severe" impairments: lumbar radiculopathy, lumbar disc degeneration with L5-S1 herniation, displacement of S1 nerve root, neuralgia neuritis and radiculitis, ocular migraines, numbness bilateral lower extremities, and morbid obesity. (R. 21).

At step three, the ALJ found that, while severe, Plaintiff did not have an impairment or combination of impairments that met the criteria for one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). (R. 22).

Before proceeding to step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC"), finding that:

> [Plaintiff] has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) except that he may only occasionally exert foot controls bilaterally, can frequently handle bilaterally, can occasionally balance, stoop, kneel, crouch, and climb ramps and stairs, but never crawl or climb ladders, ropes or scaffolds. Additionally, the claimant must avoid all hazards including

> unprotected heights and dangerous machinery and must be in a quiet environment.

(*Id.*). The ALJ's supporting analysis explains that his assessment was made using "the medical opinions where available, the daily activities, the location, duration, frequency, and intensity of symptoms, precipitating and aggravating factors, the type dosage, effectiveness and side effects of medication, and the treatment received other than medication." (R. 24).

At step four, the ALJ determined that Plaintiff would be unable to perform any of his past relevant work because the demands of his past relevant work would exceed the demands of sedentary work as assessed in the ALJ's RFC determination. (R. 25).

At step five, despite Plaintiff's inability to perform any of his past relevant work, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. 25–26). Based on Plaintiff's age, education, job skills, and work experience, as well as testimony from the vocational expert, the ALJ found that Plaintiff would be able to work as a food order clerk, polishing machine operator, or a sorting machine operator. (*Id.*).

## III. DISCUSSION

### A. Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. § 404.1520. The Regulations define residual functional capacity as "the most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 404.1545. In assessing the RFC of a claimant with multiple impairments, the SSA considers all "medically determinable impairments," including impairments that are not severe. *Id.* at § 404.1545(a)(2). The claimant bears the burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

B.      **Standard of Review**

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which

13

conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon a legal error. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may only reject the facts found by the ALJ "if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

  **C.**  **Analysis**

  Plaintiff challenges the Commissioner's denial decision, arguing that: (1) he was denied a full and fair hearing; (2) the ALJ's decision was not supported by the medical evidence; (3) he was unable to work due to the combination of his spinal impairment and his morbid obesity; and (4) the Appeals Council erred by not considering new and material evidence from Plaintiff's primary care provider. (Dkt. No. 11, pp. 15–35). Plaintiff claims that he lacks the "exertional ability to perform sedentary work," which requires an individual to remain seated for approximately six hours of an eight-hour workday. (*Id.*, pp. 25–27). Plaintiff also contends that "the ALJ erred by not giving sufficient weight to the medical opinions of [his] treat[ing] providers," and "replaced their findings and opinions with his own." (*See id.*, pp. 20–23).

  In response, the Commissioner asserts that the ALJ properly evaluated the opinion evidence in the record. (Dkt. No. 14, pp. 17–22). Specifically, the Commissioner contends that the ALJ did not err by assigning "limited weight" to NP Schneider because she "is not an acceptable medical source," and her "opinions were inconsistent with or unsupported by her

14

objective findings." (*Id.*, p. 18). The Commissioner asserts that the ALJ properly discounted Plaintiff's subjective symptoms due to "discrepanc[ies] between Plaintiff's allegations of debilitating pain and the objective record showing full strength, range of motion, deep tendon reflexes, and sensory functioning." (*Id.*, p. 23).

The key dispute in this case is whether the RFC formulated by the ALJ is supported by substantial evidence. In deciding a disability claim, an ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole," even if that finding does not perfectly correspond with any of the opinions of cited medical sources. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). However, an ALJ is not a medical professional, and he "is not qualified to assess a claimant's RFC on the basis of bare medical findings." *Ortiz v. Colvin*, 298 F. Supp. 3d 581, 586 (W.D.N.Y. 2018). In other words, there must be substantial evidence to support a finding of functional limitation(s) or lack thereof. Relatedly, under the treating physician rule, an ALJ owes "deference to the medical opinion of a claimant's treating physician[s]." *Church v. Colvin*, 195 F. Supp. 3d 450, 453 (N.D.N.Y. 2016) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). But if a treating physician's opinion is not consistent with other substantial evidence in the record, such as the opinions of other medical experts, the ALJ need not give the treating source opinion controlling weight. *Id.*

Here, the ALJ determined that the Plaintiff maintained the RFC to perform "sedentary work as defined in 20 CFR § 404.1567(a)," with some additional limitations. (R. 22). The Regulations define "sedentary work" as a job which primarily involves sitting, "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job

15

duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.* The Regulations are interpreted to mean that sedentary jobs "generally involve[] up to two hours of standing or walking and six hours of sitting in an eight-hour workday." *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (citing SSR 83-10, 1983 WL 31251, at *5); *see also* SSR 96-9p, 1996 WL 362208, 61 Fed. Reg. 34478, at *34482 ("In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals."). Moreover, because "the concept of sedentary work contemplates substantial sitting[,] . . . alternating between sitting and standing may not be within the concept of sedentary work." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (citations omitted).

Upon review of the record, the Court finds that the RFC is not supported by substantial evidence because the ALJ failed to explain how Plaintiff would be able to perform sedentary work given that it requires the ability to sit for six hours in the workday. *See* SSR 96-9p, 61 Fed. Reg. at *34482 ("[i]f an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded"). Although the ALJ summarized the medical evidence, the decision does not specifically explain what evidence supports his RFC determination.

The ALJ appears to have relied on certain clinical findings, such as negative straight leg tests, combined with Plaintiff's activities of daily living, which included watching television, grocery shopping, preparing meals, and performing light housework.[2] (R. 23–25).

---

[2] Plaintiff's activities also appear to be more limited than described in the ALJ's decision. For example, the ALJ states that Plaintiff "reports daily activities as including . . . exercising three times daily, going to appointments, grocery shopping, using the computer, visiting his son, and getting the mail." (R. 24). The ALJ also states that Plaintiff was able to "prepare meals several times a week," and can perform light housework if "he sits in between tasks." (*Id.*). Notably, the ALJ failed to acknowledge that the

16

The ALJ also stated that the "the lack of [a] current treatment plan, the absence of stronger prescription pain medication, and the non-existence of treatment with an orthopedic specialist tend to lessen the persuasiveness of the allegations presented and fail to show the claimant's ability to perform sitting and lifting within the guidelines of sedentary work." (R. 23–24).

However, this narrow array of facts and negative inferences does not amount to substantial evidence for the assessed RFC, particularly since it lacks any basis in the opinions from providers who examined Plaintiff. Indeed, Plaintiff's providers indicated that he is unable to sit, stand, or walk for even short periods of time. Specifically, NP Schneider assessed that Plaintiff had a "severe disc bulge and nerve impingement" and could only sit and stand for ten minutes at a time, and that he could only walk for five minutes at a time. (R. 14). She opined that he could "sit only" for less than one hour in an 8-hour workday. (*Id.*). NP Schneider's assessments were later co-signed and comprehensively adopted by Dr. Hausrath, Plaintiff's treating physician, who had personally examined Plaintiff and reviewed his medical records. (R. 15). The opinions from Plaintiff's treating providers are consistent with Plaintiff's frequent reports of severe pain and inability to sit, stand, or walk for prolonged periods. (*See* R. 176–77). Yet the ALJ gave little weight to NP Schneider's opinion and failed to acknowledge that it was seconded by Dr. Hausrath, whose opinion ought to have been accorded controlling weight. Further, the ALJ only gave some weight to the opinion of the consultative examiner, Dr. Wassef, who found that Dr. Wassef's determination that Plaintiff had "moderate" limitations to sitting, standing, and walking. (R. 241). Importantly, Dr. Wassef made no assessment as to Plaintiff's ability to sit for prolonged periods.

---

"exercises" Plaintiff referred to are his prescribed "[physical therapy] exercises," the meals referred to were described as "quick meals," that Plaintiff's mother and son do most of the shopping, cooking, and chores, and Plaintiff's reference to "shopping" was limited to periods of "less than five minutes as needed." (R. 173–75).

There is also considerable medical evidence showing that Plaintiff would be unable to meet the demands of *any type* of sedentary work due to his limitation to prolonged sitting. Indeed, the ALJ recognized that Plaintiff's diagnostic X-ray and MRI from July 2015 showed evidence of a small disc herniation with nerve root involvement, and degenerative spondylosis with mild disc bulging. (R. 23). Following his injury in July 2015, Plaintiff attended monthly appointments with NP Schneider and sought more specialized treatment from a neurosurgeon, a physical therapist, a chiropractor, and a pain management clinician. (*See generally* Dkt. No. 8). The ALJ noted that Plaintiff frequently presented to medical appointments with an "altered or limping gait," and was "discharged [from physical therapy] after only a few sessions due to [his] poor tolerance to exercise and poor pain control." (R. 23). The ALJ also noted that Plaintiff consistently complained of severe pain symptoms, achieved little relief through epidural steroid injections, and that his "excessive weight contributes to and exacerbates [his] difficulties[] and further limits the ability to engage in exertional activities." (*Id.*).

In sum, the RFC in this case lacks any support from providers who examined Plaintiff and fails to draw a clear connection to the medical evidence. The select medical findings and daily activities cited by the ALJ do not amount to substantial evidence. Therefore, Plaintiff's case must be remanded for further proceedings consistent with this Order. *See Niles v. Astrue*, 32 F. Supp. 3d 273, 285–87 (N.D.N.Y. 2012) (remanding for further proceedings where the RFC for sedentary work was not supported by substantial evidence and the ALJ discredited important findings from treating providers and otherwise relied heavily on activities of daily living); *see also Hardy v. Comm'r of Soc. Sec.*, No. 19-CV-915, 2020 WL 392040, at *6–7, 2020 U.S. Dist. LEXIS 12086, at *17–21 (S.D.N.Y. Jan. 23, 2020) (remanding for further proceedings where the ALJ failed to provide sufficient explanation and rationale to support an

RFC for sedentary work); *Van v. Comm'r of Soc. Sec.*, No. 15-CV-0094, 2016 WL 3526076, at *7–9, 2016 U.S. Dist. LEXIS 81961, at *14–26 (N.D.N.Y. May 27, 2016) (same).

On remand, the Commissioner should focus on the impact of Plaintiff's chronic pain on his ability to sit for the required six hours of an eight-hour workday, paying particular attention to the opinions of Plaintiff's treating providers. Further, the Commissioner should obtain and consider the treatment records from Plaintiff's neurosurgical consultation ("Dr. Horgan").[3] (*See* R. 10). The Commissioner should also review and consider the evidence submitted to the Appeals Council after the ALJ's decision.[4] (*See* R. 10–15). Then, if appropriate, the ALJ should develop an RFC that is supported by substantial evidence and that considers Plaintiff's limitations to prolonged sitting, and otherwise accounts for potential erosion of the unskilled sedentary occupational base available to him given his physical limitations. At a minimum, the Commissioner should properly address all of the medical opinions and other evidence, re-assess Plaintiff's credibility, and clearly present the evidence upon which the Commissioner relies to support an RFC determination.[5]

---

[3] The absence of such records strongly suggests that there was a failure to develop the record, particularly since Plaintiff lacked an attorney at the administrative level.

[4] After the ALJ issued his decision, NP Schneider wrote a letter rebutting the ALJ's findings as to the consistency of Plaintiff's treatment plan with his allegations of severe pain. (R. 10–11). She noted that Plaintiff: (1) was "forced to discontinue each of [his pain] medications due to severe side-effects"; (2) went to a neurosurgeon to assess options for surgical intervention, but it was determined that his injuries could not be corrected with surgery; and (3) had adopted a treatment plan that "consists primarily of symptom/pain control efforts," including frequent rest and repositioning, because more aggressive approaches had failed. (*Id.*). The Appeals Council found that "this evidence does not show a reasonable probability that it would change the outcome of the decision." (R. 2).

[5] Because remand is necessary in this case, the Court declines to address the additional arguments advanced by Plaintiff in support of the same relief. *See, e.g.*, *Insalaco v. Comm'r of Soc. Sec.*, 366 F. Supp. 3d 401, 410 (W.D.N.Y. 2018) (declining to reach the plaintiff's additional arguments after remanding for further administrative proceedings on alternative bases); *Bell v. Colvin*, No. 5:15-CV-01160, 2016 WL 7017395, at *10, 2016 U.S. Dist. LEXIS 165592, at *32 (N.D.N.Y. Dec. 1, 2016) (declining to reach arguments "devoted to the question whether substantial evidence supports various determinations made by [the] ALJ" where the court had already determined remand was warranted).

## IV. CONCLUSION

For the foregoing reasons it is

**ORDERED** that the Commissioner's decision is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Date: April 13, 2020
Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge